**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Andrea Seberson, on behalf of herself and all other similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> University of Minnesota, <br><br> Defendant. | Case No. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Andrea Seberson on behalf of herself and a proposed class of those similarly situated, brings this class action against Defendant University of Minnesota ("UMN" or "Defendant"). Plaintiff alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

1.      UMN is a public university with several campuses throughout the State of Minnesota. UMN is the oldest and largest in the University of Minnesota system and has the ninth-largest main campus student body in the United States. UMN claims to have more than fifty thousand students and 485,000 alumni.[1] UMN holds itself out as "[a]n [i]ndispensable [e]ngine for Minnesota" that "contributes more than $8.6 billion a year in economic activity to the state."[2]

2.      In connection with their participation in the services and operations of

---

[1] About Us, UMN (last visited, Aug. 22, 2023), https://twin-cities.umn.edu/about-us.
[2] *Id.*

1

UMN, students, employees, applicants, and others affiliated with UMN provide it highly sensitive personal information, including Personally Identifying Information ("PII") including, among other things, names, addresses, telephone numbers, email addresses, and social security numbers. UMN gathers this information and stores it on its servers in a database.

3.      This type of personal and sensitive data is highly targeted by hackers who seek to exploit it for nefarious purposes. Indeed, PII—social security numbers in particular—have inherent value and are routinely marketed and sold on the dark web. In the wrong hands, the PII UMN collects and stores may be utilized to cause significant harm to the those who provided this information to UMN, including a host of fraudulent schemes.

4.      The value of this information on the dark web is well recognized in the modern data economy, and the risk to customers' identities resulting from data breaches foreseeable and known to large operations that gather and store data, including Defendant.

5.      UMN gathers, stores, and uses PII it gathers from students, applicants, employees, and other individuals. As such, UMN has a duty to protect the sensitive data it retains. Indeed, it admits to being governed by the Minnesota Government Data Practices Act ("MNGDPA") and that it may not release personal information without the permission of the individual.[3] Further, under Minn. Stat. § 13.05, subd. 5(2) of the MNGDPA, entities like UMN must "establish appropriate security safeguards for all records containing data

---

[3] Online Privacy, UMN https://privacy.umn.edu (last visited Sep. 6, 2023).

on individuals, including procedures for ensuring that data that are not public are only accessible to persons whose work assignment reasonably requires access to the data, and is only accessed by those persons for purposes described in the procedure."

6.      Despite the mandates of the MNGDPA and UMN's understanding its need to implement reasonable security measures to keep PII safe, UMN failed to do so. Instead, a hacker active on the dark web with a username of "niggy" reported that he infiltrated UMN's database and gained access to PII and other sensitive information, including over 7 million unique social security numbers ("Data Breach"). The stolen information includes data from digitized records initially created as far back as 1989.

7.      On information and belief, UMN did not learn that the hacker had infiltrated and gained control over its systems to steal millions of social security numbers until after the hacker had successfully done so. Indeed, UMN only recently started investigating the Data Breach as of July 21, 2023. The hacker has already purported to have made the information available on the dark web.

8.      The Data Breach has already had serious consequences and will continue to do so. As a direct and proximate result of UMN's inadequate data security and the resulting data breach that such lack of cybersecurity measures enabled, Plaintiff and the Class have suffered, and will continue to suffer, economic damages and other actual harms, including from: (i) the untimely and inadequate notification of the Data Breach, (ii) the diminished value of their personal information; (iii) the resulting immediate and continuing risk of future damages caused by misuse of their PII, (iv) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts; (v) out-

3

of-pocket expenses for securing identity theft protection and other similar necessary services; and (iv) emotional harm and distress from the exposure of their sensitive records and the prolonged and heightened risk of harm.

9.      Plaintiff, therefore, brings this Class Action Complaint seeking relief for her injuries and those of persons who were similarly impacted by the Data Breach and inadequate data security.

## JURISDICTION

10.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, minimal diversity is met under the Class Action Fairness Act because at least one member of the proposed Class is diverse from the Defendant. UMN is located and operates exclusively in the State of Minnesota and is a citizen of only that State. The Class is comprised of applicants for admission to UMN, as well as current and former students and employees of UMN, which includes individuals who are citizens of states across the country. Plaintiff alleges that, in the aggregate, the claims of all putative class members exceed $5,000,000, exclusive of interest and costs.

11.      This Court has general personal jurisdiction over UMN because UMN is located entirely within the State of Minnesota and is a Minnesota public institution operating on behalf of the State of Minnesota. UMN has minimum contacts with Minnesota because it is located there and conducts substantial business there, and Plaintiff's claims

arise from UMN's conduct in Minnesota.

12.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Minnesota and because UMN conducts a substantial part of its business within this District.

## PARTIES

13.     Plaintiff Andrea Seberson is a citizen of Minnesota. Seberson applied to attend school as an undergraduate at UMN. In her application, she provided UMN with her PII, including her name, contact information, Social Security Number, and date of birth, among other information. She was accepted to UMN and attended from 2003 to 2004. Seberson, as an applicant and student at UMN, reasonably believed her PII was stolen from UMN, especially because the stolen information includes a folder containing applicant data dating back to 1989.

14.     Defendant University of Minnesota, or UMN, is a higher education public institution in the State of Minnesota that accepts applicants to its undergraduate and graduate programs from people throughout the United States and from non-U.S. born individuals. It, furthermore, employs thousands of staff in academic and non-academic roles.

## BACKGROUND

**A. UMN gathers and retains personal sensitive information of students, employees, and applicants, among others.**

15.     UMN is one of the nation's premier public higher education institutions.

Annually, it accepts thousands of applicants into its undergraduate and graduate programs. It also retains thousands of employees to maintain its operations. As of 2022, UMN employed 4,033 academic staff, over 24,000 staff generally, and nearly 55,000 students, including 30,560 undergraduates, 11,613 postgraduates, and 3,875 doctoral students.

16. From its applicants, students, employees, and potential others, UMN collects highly sensitive PII, including names, addresses, telephone numbers, email addresses, birth dates, and social security numbers. Indeed, as part of its application process, UMN's online application portal requires U.S.-born applicants to provide their social security numbers.

17. Each year, UMN receives tens of thousands of applicants and employes tens of thousands of academic and non-academic staff. Consequently, UMN has built up a massive repository of PII for millions of individuals.

18. UMN understands the importance of securing the highly sensitive PII that it gathers and retains in its database. UMN, as a public institution, is governed by the MNDGPA. Minn. Stat. § 13, et seq. The MNGDPA governs "all governmental entities" and was enacted to regulate the "collection, creation, storage, maintenance, dissemination, and access to government data in government entities." Under the MNGDPA, government entities are obliged to collect and handle the data they collect and maintain in certain ways, including: "establish[ing] appropriate security safeguards for all records containing data on individuals, including procedures for ensuring that data that are not public are only accessible to persons whose work assignment reasonably requires access to the data and is only being accessed by those persons for purposes described in the procedure;" and

6

"developing a policy incorporating these procedures, which may include a model policy governing access to the data if sharing of the data with other government entities is authorized by law." *Id.* at § 13.05, subd. 5(a)(1)–(2).

19.     The MNGDPA, similarly, requires that "[w]hen not public data is being disposed of, the data must be destroyed in a way that prevents its contents from being determined." Id. at subd. 5(b). For more than 20 years, the MNGDPA has also required that governmental entities "appoint or designate . . . [a] data practices compliance official" to resolve "problems in obtaining access to data or other data practices problems." *Id.* at subd. 13.

20.     Furthermore, the MNGDPA requires UMN to obtain annual security assessments of any personal information it maintains. *Id.* at § 13.055, subd. 6. Highlighting the significance of protecting data against unauthorized disclosure, when a breach does occur, the MNGDPA requires government entities to notify impacted individuals "in the most expedient time possible and without unreasonable delay" *Id.* at subd. 2(a).

21.     UMN acknowledges its obligations to protect data under the MNGDPA and admits that it is well aware of the importance of sufficient cybersecurity measures against unauthorized access.[4]

22.     Despite its knowledge, UMN failed to enact measures sufficient to protect against a data breach. In August 2023, a hacker known as "niggy" released millions of social security numbers and other PII stolen from a UMN database.

**B. UMN's inadequate cybsersecurity measures the PII of Plaintiff and Class**

[4] *Id.*

**Members.**

23.     On August 22, 2023, the University of Minnesota confirmed that it had contacted law enforcement concerning a potential data breach of which it had become aware on on July 21, 2023.[5] Specifically, representatives of UMN stated that they became aware that an "unauthorized party" had claimed to possess sensitive data taken from UMN's computer systems.[6]

24.     UMN became aware of the data breach from disclosures made by the purported hacker. On July 21, 2023, a hacker with a username "niggy" posted on the dark web and claimed to have accessed UMN's database and obtained sensitive information, including social security numbers, for over seven million unique individuals.[7] The hacker exploited a Computer Network Exploitation or "CNE," which is often used to infiltrate a target's computer networks to extract and gather data. The hacker here successfully breached UMN's database, uncovering sensitive information dating back to records initially created in 1989 and later digitized.[8]

25.     The information leaked on the dark web was reportedly listed in two tables, one named "PS_DIVERSITY," concerning diversity statistics, and another named "PS_DWAD_APPL_DATA_HS," which involves admission statistics.[9] Although the scope of the data breach is not clear, the data of those applying to be admitted to UMN is

---

[5] https://www.kare11.com/article/news/local/u-of-m-investigating-claimed-databreach/89-17a1736f-a704-4495-9337-079e0c77ccd5.
[6] *Id.*
[7] https://thecyberexpress.com/university-of-minnesota-data-breach.
[8] *Id.*
[9] *Id.*

included in the PS_DWAD_APPL_DATA_HS table, indicating tens if not hundreds of thousands of individuals have had their data stolen and posted to the dark web.

26.      Moreover, former UMN regent Michael Hsu warned that "everyone should be concerned" because "even if you are a former student or staff you still have data in the university system."[10]

27.      Mark Lanterman, the Chief Technology Officer at Computer Forensic Services, warned that anyone potentially affected by the Data Breach should freeze their credit reports to prevent new credit being opened in their names.[11]

28.      According to UMN, they have run scans which indicate no ongoing suspicious activity.[12] Thus, the hacker successfully entered into UMN's networks, gained access to UMN's database, exfiltrated a significant quantity of data, including PII, all without detection by UMN or any of its security tools or personnel. Indeed, UMN only became aware of the attack after the hacker publicly described it and posted the stolen data.

29.      UMN has known of the Data Breach since at least July 21, 2022.

**C. The Data Breach caused Plaintiff and Class Members harm.**

30.      UMN's Data Breach resulted in the theft and exposure of confidential data, including social security numbers and other PII. Exposure of this type of data puts individuals at a significant and prolonged risk of fraud and identity theft. Indeed, personal information like that stolen from UMN is valuable and has been commoditized in recent

---

[10] https://www.kare11.com/article/news/local/u-of-m-investigating-claimed-databreach/89-17a1736f-a704-4495-9337-079e0c77ccd5
[11] *Id.*
[12] *Id.*

years because of its use in conducting identity theft and fraud.

31.     After a data breach like the one at UMN, the hackers responsible for the breach increasingly seek to sell the stolen personal and sensitive records on the black market to purchasers looking to use the PII to create fake IDs, make fraudulent transactions, obtain loans, or commit other acts of identity theft.[13]

32.     Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. Personal and sensitive data, like the type exposed in the Data Breach, is a valuable commodity to identity thieves, particularly when it is aggregated in large quantities and includes data not stolen in other breaches. As the Federal Trade Commission ("FTC") has recognized, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud, and can use stolen usernames and passwords to steal additional personal and sensitive information from other applications and websites.[14]

33.     Consequently, stolen personal and sensitive data is often trafficked and sold on the dark web—a heavily encrypted and cryptic part of the internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal their identities and

---

[13] *How do hackers make money from your stolen data?*, Emsisoft.com (Feb. 20, 2020), https://blog.emsisoft.com/en/35541/how-do-hackers-make-money-from-your-stolen-data

[14] FTC Consumer Information, What to Know about Identity Theft, ftc.gov (last visited, Aug. 13, 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

online activity generally.

34.     Stolen sensitive data sold on the dark web has proven to be valuable. For instance, cybercriminals on the dark web have sold Social Security numbers for up to $300 per number to be used on fraudulent tax returns. UMN's data breach exposed social security numbers, which are already available on the dark web.

35.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[15]

36.     Given the value of that data, a robust cyber black market exists in which criminals openly post and purchase stolen personal information on the dark web.

37.     As such, the ramifications of UMN's failure to protect Plaintiff's and Class Members' personal information are severe.

38.     When sensitive personal data is stolen, the risk of identity theft and other fraudulent acts is long-lasting. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. . . . As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of

---

[15] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Sept. 22, 2021), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

future harm."[16] Indeed, according to experts, one out of four data breach notification recipients are later victimized by identity fraud.[17]

39.     Additionally, after personal information is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can allow hackers to harvest additional sensitive and confidential information from the victim, as well as the personal information of family, friends, and colleagues of the initial victim.

40.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individual and business victims. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant here did not timely report to Plaintiff and the Class that their personal information had been stolen and, in fact, have not reported the full extent of the Data Breach to date.

41.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts. Using data stolen in data

---

[16] Report to Congressional Requesters, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).
[17] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com (last visited Sept. 22, 2021), https://threatpost.com/study-shows-one-fourwho-receive-data-breach-letter-become-fraud-victims-022013/77549.

breaches like UMN's, hackers and other wrongdoers may use consumers' personal and financial information to siphon money from existing accounts, open new accounts in the names of their victims, or sell consumers' personal information to others who do the same.

42.     Victims of identity theft often suffer indirect financial costs as well, including the costs incurred due to litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit.

43.     In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of identity theft, not to mention the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their personal information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

44.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen personal information. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

45.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[18] According to the FTC, data security

---

[18] Start With Security, A Guide for Business, FTC (last visited Sept. 22, 2021), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-

requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry unapproved activity; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[19]

46.    According to the FTC, unauthorized personal information disclosures wreak havoc on consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[20] The FTC, as such, treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

47.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In re Lookout Services, Inc.*, No. C-4326, ℙ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs*."); In re DSW, Inc.*, No. C-4157, ℙ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In re The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal

---

startwithsecurity.pdf.
[19] *Id.*
[20] Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012) (last visited Sept. 22, 2021), www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf.

information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks," "did not require network administrators . . . to use different passwords to access different programs, computers, and networks," and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . . ."); *In re Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . . ."). These orders, which all preceded UMN's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

48.     Consumers place a high value on their PII and a greater value on their PHI, in addition to the privacy of their personal information. Research shows how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US $30.49–44.62."[21]

49.     By virtue of the Data Breach here and unauthorized release and disclosure of the personal information of Plaintiff and the Class, UMN deprived Plaintiff and the Class of the substantial value of their personal information, to which they are entitled. As previously alleged, UMN failed to provide reasonable and adequate data security, pursuant

---

[21] Il-Horn Hann et al., *The Value of Online Information Privacy* (Oct. 2002) available at http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Sept. 22, 2021); *see also* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22 (2) Information Systems Research 254, 254 (June 2011).

to and in compliance with industry standards and applicable law.

50.     Identity theft associated with data breaches is particularly pernicious due to the fact that the information is made available, and has usefulness to identity thieves, for an extended period of time after it is stolen.

51.     As a result, victims suffer immediate and long-lasting exposure and are susceptible to further injury over the passage of time.

52.     Even absent any adverse use, consumers suffer injury from the simple fact that their PII has been stolen. When personal information, especially social security numbers, is stolen, accounts become less secure, and the information once used to sign up for bank accounts and other financial services is no longer as reliable as it had been before the theft. In short, this information can no longer guarantee Plaintiff and the Class's identities.

53.     As a direct and proximate result of UMN's wrongful actions and omissions, Plaintiff and the Class have suffered, and will continue to suffer, ascertainable losses, economic damages, and other actual injury and harm, including: (i) the resulting immediate and continuing risk of future ascertainable losses, economic damages and other actual injury and harm, (ii) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts—for which they are entitled to compensation; (iii) out-of-pocket expenses for securing identity theft protection and other similar necessary services; (iv) the dimiunition in value of their social security numbers and other private information, the value of which is derived from its confidentiality and privacy; and (v) emotional distress caused by the impending risk of fraud and identity theft

16

and the loss of privacy, confidentiality, and value of their personal information.

## <u>CLASS ALLEGATIONS</u>

54.     Plaintiff brings this action on behalf of herself and all other similarly situated Class Members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Nationwide Class:

**All individuals whose PII was stolen from UMN during the Data Breach**

55.     Excluded from the Class is UMN and its subsidiaries and affiliates;; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

56.     Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition, to add subclasses, or to seek certification of a class or subclass defined differently than as described above before the Court determines whether certification is appropriate.

57.     Numerosity. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are millions of members of the Nationwide Class. The number of reportedly impacted individuals already exceeds seven million U.S. individuals—and each persons' information is readily available to download on the dark web. The precise number of class members, however, is not yet known to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

58.     Commonality and Predominance. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. The common questions include, without limitation:

a.  Whether UMN knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

b.  Whether UMN controlled and took responsibility for protecting Plaintiff's and the Class's data when it solicited that data, collected it, and stored it on its servers;

c.  Whether UMN's security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d.  Whether UMN breached the MNGDPA by implementing and using unreasonable data security measures;

e.  Whether UMN owed Plaintiff and the Class a duty to implement reasonable security measures;

f.  Whether UMN's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

g.  Whether UMN's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

18

    h.   Whether reasonable security measures known and recommended by the data security community could have prevented the breach; Whether Plaintiff and the Class were injured and suffered damages or other losses because of UMN's failure to reasonably protect its data systems; and,

    i.   Whether Plaintiff and the Class are entitled to relief.

59.    **Typicality.** Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the Class. Plaintiff provided data to UMN, whose data resided on UMN's servers, and her PII was exposed in the Data Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

60.    **Adequacy.** Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against UMN to obtain relief for herself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff also has retained counsel competent and experienced in complex class action litigation of this type, having previously litigated numerous data breach cases on behalf of consumers and financial institutions. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

61.    **Superiority.** Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

62.     Injunctive and Declaratory Relief. Consistent with Fed. R. Civ. P. 23(b)(2), UMN, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence - Minnesota Tort Claims Act Minn. Stat. § 3.736
### (on behalf of the Nationwide Class)

63.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

64.     UMN owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class, managed, and stored. This duty arises from multiple sources.

65.     UMN owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target UMN's databases because it contained millions of individuals' valuable PII and, UMN further knew that, should a breach occur, Plaintiff and the Class would be harmed. UMN alone controlled its technology, infrastructure, digital platforms, and cybersecurity that

were exposed during the Data Breach and allowed hackers to breach and steal information from its database. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. UMN knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen, and that individual need would continue long after the Data Breach ended. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of UMN's unsecured, unreasonable data security measures.

66.     Further, UMN assumed a duty to protect individuals' data by soliciting sensitive PII, collecting that data, and storing that data in its own databases. In fact, Plaintiff and the Class were required to social security numbers and other PII in order to obtain employment or apply to attend UMN. UMN was the only entity capable of implementing reasonable measures to protect Plaintiff's and the Class's sensitive data.

67.     UMN is obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring UMN to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class. Industry best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, UMN was the only entity capable of adequately protecting the data that it alone solicited, collected, and stored.

68.     UMN breached its duty to Plaintiff and the Class by implementing

unreasonable data security measures that it knew or should have known could cause a Data Breach. UMN recognized the need to keep PII confidential and safe from cybercriminals who targeted it. Despite that, UMN implemented unreasonable data security that allowed a single hacker to breach its systems, gain control over them, access its database, and exfiltrate data on millions of individuals, all undetected.

69.     UMN was fully capable of preventing the Data Breach. UMN is a sophisticated entity that accounts for one of the most respected public higher education entity in the world. It knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented and used, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. UMN thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

70.     As a direct and proximate result of UMN's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes. Plaintiff, therefore, seek all remedies available under the law for UMN's negligence.

**COUNT II**
**Negligence Per Se - Minnesota Tort Claims Act Minn. Stat. § 3.736**
**(on behalf of the Nationwide Class)**

71.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

72.     UMN owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and

the Class, managed and stored. This duty arises from multiple sources.

73.     UMN owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target UMN's databases because it contained millions of individuals' valuable PII and, UMN further knew that, should a breach occur, Plaintiff and the Class would be harmed. UMN alone controlled its technology, infrastructure, digital platforms, and cybersecurity that were exposed during the Data Breach and allowed hackers to breach and steal information from its database. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. UMN knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen, and that individual need would continue long after the Data Breach ended. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of UMN's unsecured, unreasonable data security measures.

74.     UMN, furthermore, assumed a duty to protect individuals' data by soliciting sensitive PII, collecting that data, and storing that data in its own databases. In fact, Plaintiff and the Class were required to social security numbers and other PII in order to obtain employment or apply to attend UMN. UMN was the only entity capable of implementing reasonable measures to protect Plaintiff's and the Class's sensitive data.

75.     Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required UMN to take reasonable measures to protect Plaintiff's and the

Class's sensitive data and is a further source of UMN's duty to Plaintiff and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by entities like UMN of failing to implement and use reasonable measures to protect sensitive data. UMN, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of UMN's duty to adequately protect sensitive information. By failing to implement and use reasonable data security measures, UMN acted in violation of § 5 of the FTCA.

76.     Plaintiff and the Class are individuals who the FTCA aims to protect, and the harm they suffered as a result of the breach are the harms the FTCA seeks to prevent.

77.     UMN is obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring UMN to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class. Industry best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, UMN was the only entity capable of adequately protecting the data that it alone solicited, collected, and stored.

78.     UMN breached its duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. UMN recognized the need to keep PII confidential and safe from cybercriminals who targeted it. Despite that, UMN implemented unreasonable data security that allowed a single hacker to breach its systems, gain control over them, access its database, and

exfiltrate data on millions of individuals, all undetected.

79.     UMN was fully capable of preventing the Data Breach. UMN is a sophisticated entity that accounts for one of the most respected public higher education entity in the world. It knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented and used, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. UMN thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

80.     A private individual who acted as UMN did under the circumstances alleged herein would be liable to Plaintiff and the Class.

81.     As a direct and proximate result of UMN's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes. Plaintiff, therefore, seek all remedies available under the law for UMN's negligence.

### COUNT III
### Violation of the Government Data Practices Act, Minn. Stat. ch. 13.
### (On behalf of the Nationwide Class)

82.     Plaintiff repeat and re-allege the allegations contained in the preceding paragraphs as if fully set forth herein.

83.     Under the MNGDPA, a government entity that "violates any provision of this chapter is liable to a person or representative of a decedent who suffers any damages as a result of the violation, and the person damaged . . . may bring an action against the responsible authority or government entity to cover any damages sustained, plus costs and

reasonable attorneys fees." Minn. Stat. § 13.08, subd. 1. Furthermore, "[t]he state is deemed to have waived any immunity to a cause of action brought under this chapter." *Id.* Additionally, the MNGDPA states that "[a] responsible authority or government entity which violates or purposes to violate this chapter may be enjoined by the district court." *Id.* at subd. 2.

84.     The MNGDPA governs UMN and applies to its storage of Plaintiff's and the Class's personal information. Minn. Stat. § 13.01, subd. 1 ("All governmental entities shall be governed by this chapter.").

85.     Under the MNGDPA, UMN was required to "establish appropriate security safeguards for all records containing data on individuals, including procedures for ensuring that data that are not public are only accessible to persons whose work assignment reasonably requires access to the data, and is only being accessed by those persons for purposes described in the procedure." Minn. Stat. § 13.05, subd. 5(a)(2).

86.     Furthermore, the MNGDPA required UMN to obtain annual security assessments of any personal information maintained by the government entity. *Id.* at § 13.055, subd. 6. Highlighting the significance of protecting data against unauthorized disclosure, when a breach does occur, the MNGDPA requires government entities to notify impacted individuals "in the most expedient time possible and without unreasonable delay . . . ." *Id.* at subd. 2(a).

87.     UMN acknowledges its obligations to protect data under the MNGDPA, indicating that it is well aware of the importance of security data against unauthorized access.

88.     However, UMN failed to adopt "appropriate security safeguards" to protect Plaintiff's and the Class's highly sensitive information that it stored in its database. The lack of appropriate security safeguards is made clear by the means by which the Data Breach occurred. Specifically, a single hacker with no apparent history of orchestrating data breaches as part of a cybercrime organization singlehandedly infiltrated UMN, obtained control over its networks and access to its databases, successfully exfiltrated a massive amount of data involving over seven million individuals, and exfiltrated that data all without detection. UMN had no idea it had been breached and the data on its databases stolen until the hacker publicly disclosed the breach and, by the time UMN began investigating it, the hacker, having succeeded in obtaining a swath of valuable data, had already ceased activity within UMN's networks and servers. UMN, therefore, violated the MNGDPA.

89.     Plaintiff, furthermore, suffered damages as a result of the Data Breach, which occurred directly because of UMN's violation of the MNGDPA and its failure to adopt appropriate security safeguards.

90.     Specifically, Plaintiff's and the Class's highly sensitive information has been placed on the dark web where cybercriminals have access to it and opportunity to misuse it. Consequently, the confidentiality, integrity, and value of this sensitive information has been diminished because it can no longer guarantee Plaintiff and the Class's identities. Plaintiff and the Class were also damaged due to the need to expend time, effort, and money monitoring their financial accounts, social media applications and their credit scores to identify any misuse of their data. Plaintiff, in fact, remained at a

27

heightened and substantial risk of harm due to the misuse of her data which has been placed directly in the hands of criminals. Finally, Plaintiff suffered emotional distress stemming from the disclosure of her sensitive data and the heightened and prolonged risk of harm she now suffers.

91.     A private individual who acted as UMN did under the circumstances alleged herein would be liable to Plaintiff and the Class.

92.     Plaintiff, therefore, seeks to recover the damages she suffered and costs and attorneys' fees.

## PRAYER FOR RELIEF

93.     Wherefore, Plaintiff, on behalf of herself and the Class, requests that this Court award relief as follows:

    a. An order certifying the class and designating Plaintiff as Class Representative and her counsel as Class Counsel;

    b. An award to Plaintiff and the proposed Class Members of damages with pre-judgment and post-judgment interest;

    c. A declaratory judgment in favor of Plaintiff and the Class;

    d. Injunctive relief to Plaintiff and the Class;

    e. An award of attorneys' fees and costs pursuant to the MNDGPA and as otherwise allowed by law; and

    f. An award of such other and further relief as the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands that this matter be tried before a jury.

DATE: September 8, 2023                    Respectfully Submitted,

*/s/David A. Goodwin*
Daniel E. Gustasfon (#202241)
David A. Goodwin (#0386715)
Joseph E. Nelson (#0402378)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
jnelson@gustafsongluek.com

***Attorneys for Plaintiff***